IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

KIMBERLY PEPPER,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     Case No.
                                    )     12-5032-CV-SW-REL-SSA
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kimberly Pepper seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Title XVI of

the Social Security Act ("the Act").  Plaintiff argues that (1) the ALJ erred in failing to

give more weight to the opinions of Dr. McDermid and Dr. Alberty regarding plaintiff's

mental impairment and by giving too much weight to Dr. Akeson who did not examine

plaintiff, and (2) the ALJ erred in finding that plaintiff can lift and carry 50 pounds

occasionally and 25 pounds frequently, without having sought an opinion from plaintiff's

treating physicians or alternatively having ordered a consultative exam.  I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is

not disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the

decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On July 7, 2010, plaintiff applied for disability benefits alleging that she had been

disabled since September 23, 2009.  Plaintiff's disability stems from coronary artery

disease, colitis, stomach inflammation, post traumatic stress disorder, anxiety and

depression.  Plaintiff's application was denied on October 1, 2010.  On August 22,

2011, a hearing was held before an Administrative Law Judge.  On October 27, 2011,

the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On

January 6, 2012, the Appeals Council denied plaintiff's request for review.  Therefore,

the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a

"final decision" of the Commissioner.  The standard for judicial review by the federal

district court is whether the decision of the Commissioner was supported by substantial

evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

determination of whether the Commissioner's decision is supported by substantial

evidence requires review of the entire record, considering the evidence in support of

and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The

Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450

U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

3

1.	Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.	Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.	Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.	Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.	Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.	THE RECORD

The record consists of plaintiff's testimony and documentary evidence admitted at the hearing.

## A.	ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1975 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1975 | $ 1,129.00 | 1994 | $ 0.00 |
| 1976 | 590.13 | 1995 | 0.00 |
| 1977 | 329.48 | 1996 | 2,075.65 |
| 1978 | 7,249.37 | 1997 | 7,201.25 |
| 1979 | 14,377.33 | 1998 | 1,004.68 |
| 1980 | 17,986.94 | 1999 | 339.26 |
| 1981 | 975.87 | 2000 | 63.56 |
| 1982 | 2,048.64 | 2001 | 0.00 |
| 1983 | 3,846.51 | 2002 | 0.00 |
| 1984 | 3,212.14 | 2003 | 0.00 |
| 1985 | 7,739.36 | 2004 | 10,069.25 |
| 1986 | 2,060.11 | 2005 | 4,130.34 |
| 1987 | 1,085.82 | 2006 | 5,581.46 |
| 1988 | 0.00 | 2007 | 6,028.20 |
| 1989 | 89.00 | 2008 | 3,007.20 |
| 1990 | 2,574.38 | 2009 | 1,984.80 |
| 1991 | 150.88 | 2010 | 0.00 |
| 1992 | 303.26 | 2011 | 0.00 |
| 1993 | 0.00 | | |

(Tr. at 114).

I note that plaintiff testified she worked 20 hours a week for minimum wage through the first half of February 2010 and in her Disability Report she reported that she stopped working on February 28, 2010 (Tr. at 132), and she told Dr. Ballard in July 2010 that she was working as a cleaning lady at a church; however, no earnings have been reported for 2010.

*Application for Benefits*

In her application for benefits, plaintiff disclosed that she was convicted of a felony in the State of Texas and served her time (Tr. at 107). She reported that she has used the names Kimberly Ann Pepper and Kimberly Ann Sullins. However, I note that her earnings record includes the name Kimberly Wilson. Plaintiff reported having been married one time in the past, a marriage that ended in divorce. However, she told medical experts that she had been married and divorced four times.

*Function Report*

In an August 3, 2010, Function Report plaintiff said she gets up around 7:00 a.m. and feeds the dog, eats, then goes back to sleep until around 10:00 (Tr. at 166). She then watches television, eats lunch, watches more television, plays with the dog and sweeps the floors. When her boy friend comes home from work, they go to Wal-Mart together or out to eat sometimes. She goes to Sunday School and church on Sundays, then she rests until Bible School. Plaintiff feeds and waters her dogs and cleans up their droppings. Plaintiff prepares her own meals -- sandwiches, pizza, hamburger, or she will "bake complete meals" (Tr. at 168). Plaintiff does her own laundry, she sweeps, and she tries to mop once a month. She tries to go outside every day for 15 minutes (Tr. at 169). She is able to go out alone. She does not drive because she has post traumatic stress syndrome and has panic attacks. She shops in stores. "I go to Walmart and I can get food and medicine and other things in one place." She goes twice a week and it takes her two hours each time. Plaintiff has the TV on all day and plays with her dog a couple times a day (Tr. at 170). Once a month she has a cook-out

with friends.  She does not need anyone to accompany her to her doctor appointments (Tr. at 170).  Plaintiff can pay attention for only ten minutes (Tr. at 171).  She stresses out about everything especially in public (Tr. at 172).  She gets angry if something she has planned gets changed.

### *Disability Report - Field Office*

Plaintiff reported that she does not have transportation and so she has not been able to do anything about her depression and post traumatic stress syndrome (Tr. at 191).  She said she has tried to keep doctor appointments and has had to call friends or family to get there and has to call ahead of time because they are busy or at work.

### *B.      SUMMARY OF MEDICAL RECORDS*

On July 18, 2009, plaintiff went to the emergency room with complaints of double vision (Tr. at 287-292).  She denied prior neurological deficits; and her eyes, head, heart, lungs, extremities, cognitive function, mentation, sensation, reflexes, strength, and gait were normal. She reported smoking one pack of cigarettes per day.  She denied diarrhea, constipation, any type of gastrointestinal pain, anxiety, depression, or any other mental impairment.  Computed tomography (CT) of plaintiff's brain showed no acute intracranial abnormality, and x-rays of her chest were normal.  Plaintiff was prescribed Lisinopril for blood pressure and told to quit smoking (Tr. at 289).

On August 17, 2009, plaintiff was seen by Kevin Whisman, Psy.D., in connection with her application for government benefits from the Jasper County's Family Support Division (Tr. at 380-383).  No medical records were available for Dr. Whisman to review; therefore, "all information was obtained from Ms. Pepper" (Tr. at 380).  Plaintiff's

gait was normal, her hygiene was excellent, her hair was neatly groomed.  She had a little difficulty maintaining eye contact.  All of her affective responses were within normal limits.  Her mood was dysphoric.  Her speech was not distorted, did not include interruptions of speech melody, and she did not display any impairment in the production or comprehension of spoken language.  Speech patterns were relevant and goal directed.

Plaintiff said that she was unable to work because she just found out she has cardiomyopathy,[1] she has anxiety attacks and is paranoid, and traffic freaks her out due to her having been kidnaped.  Plaintiff reported that in 1995 or 1996 she was kidnaped by an estranged husband.  She said that she is now depressed and has been depressed for a long time.  Sometimes she cries a lot and other times she gets very angry.  Plaintiff said that she does not sleep well because she thinks about what has happened to her and her adrenaline kicks in.

Plaintiff reported that she had no contact with her biological mother because her mother was schizophrenic.  She was raised by her father and step-mother.  She experienced a violent home life, she witnessed domestic violence, and she said, "I got used to having a gun pulled on me."  She reported a history of physical and sexual

---

[1]"Cardiomyopathy is a disease that weakens and enlarges your heart muscle.  There are three main types of cardiomyopathy -- dilated, hypertrophic and restrictive. Cardiomyopathy makes it harder for your heart to pump blood and deliver it to the rest of your body. Cardiomyopathy can lead to heart failure.  Cardiomyopathy can be treated. The type of treatment you'll receive depends on which type of cardiomyopathy you have and how serious it is. Your treatment may include medications, surgically implanted devices or, in severe cases, a heart transplant."
http://www.mayoclinic.com/health/cardiomyopathy/DS00519

abuse, ran away a lot, and left home around the age of 15.

Although plaintiff testified at the hearing that she went to school through 12th grade, she told Dr. Whisman that the highest grade she completed was the tenth. She claimed her school had to close because it got caught embezzling money; therefore, she had no choice but to quit. She claimed she got a GED and completed vocational training in broadcasting; however, in her administrative paperwork she claimed she completed vocational training in small appliance repair (Tr. at 133).

Plaintiff told Dr. Whisman she had been married four times. All of her relationships were abusive. Although she reported having no recreational interests, she did report regularly attending church. Plaintiff told Dr. Whisman that she had a history of multiple head injuries with loss of consciousness, and she had previously been treated for a concussion. "The client related a history of previous psychological services to include individual psychotherapy following the alleged abduction." Plaintiff admitted a history of marijuana use with her last use having been about a year earlier, or approximately August 2008. She said that she served 13 months in prison for trying to defraud the government (Tr. at 382).

With regard to the Personality Assessment Inventory, Dr. Whisman concluded that plaintiff's responses:

> were considered unusual as they indicated defensiveness about particular personal shortcomings as well as an exaggeration of certain problems. Furthermore, there were indications Ms. Pepper endorsed items presenting an unfavorable impression or representing particularly bizarre and unlikely symptoms. This result raises the possibility of some perhaps intentional exaggeration of complaints and problems. Patterns of this type are relatively

infrequent among bona fide clinical patients. . . .  The client expressed interest in seeking employment "if my heart could handle it."

Dr. Whisman assessed suspected Post Traumatic Stress Disorder.  "Given all information available to this examiner, it appears Ms. Pepper is experiencing a combination of features which would likely preclude her employability.  Therefore, the eligibility criteria for Medical Assistance would appear to be met.  Research has identified a combination of pharmacotherapy and psychotherapy to be the most successful in treating Ms. Pepper's reported conditions.  Therefore, the client is strongly encouraged to seek these supports."

On August 20, 2009, plaintiff had a renal ultrasound (Tr. at 306). The results were normal.

On September 22, 2009 -- the day before plaintiff's alleged onset date -- plaintiff was seen by John Nicholas, M.D., at Freeman Health Systems complaining of episodic nonexertional chest discomfort (Tr. at 207-210, 220-225, 232-233).  Plaintiff reported that three years ago she was told she had had an abnormal EKG.  Plaintiff said she was told she may have had a heart attack in the past.  Plaintiff was given a stress test -- she exercised for two minutes and had to stop due to fatigue and shortness of breath. Her heart rate reached 153.  Dr. Nicholas assessed "very limited exercise tolerance; no chest pain."  Dr. Nicholas expressed the opinion that plaintiff had a left bundle branch block[2] which caused a "false positive" apical abnormality on her stress test.  Plaintiff

_____

[2]"Bundle branch block is a condition in which there's a delay or obstruction along the pathway that electrical impulses travel to make your heart beat. The delay or blockage may occur on the pathway that sends electrical impulses to the left or the right side of your heart.  Bundle branch block sometimes makes it harder for your heart to pump

was placed on a proton pump inhibitor[3] and was told that if she continued to have any exertional chest discomfort, she could have a cardiac catheterization.[4]  Plaintiff was given a vascular study[5] which was normal (Tr. at 210).

The following day, September 23, 2009 (plaintiff's alleged onset date), plaintiff saw Dr. Nicholas again complaining of chest pain (Tr. at 213-216, 235-236).  She reported cutting down from two packs of cigarettes per day to one pack per day.  "She was given a prescription of Chantix[6] when seen a few weeks ago but has not filled the prescription."  Plaintiff reported no bowel habit changes and no diarrhea (Tr. at 213, 235).  On physical examination, Dr. Nicholas noted, "The patient appears healthy."  She has full range of motion bilaterally.  Dr. Nicholas assessed "Recurrent chest pain.  I suspect this is generally noncardiac and probably has a gastrointestinal component."

---

blood efficiently through your circulatory system."
http://www.mayoclinic.com/health/bundle-branch-block/DS00693

[3]Proton-pump inhibitors are a group of drugs whose main action is a pronounced and long-lasting reduction of gastric acid production. They are the most potent inhibitors of acid secretion available.  On September 23, 2009, Dr. Nicholas indicated he believed plaintiff's "chest pain" was gastrointestinal in nature.

[4]"Cardiac catheterization is a procedure used to diagnose and treat cardiovascular conditions. During cardiac catheterization, a long thin tube called a catheter is inserted in an artery or vein in your groin, neck or arm and threaded through your blood vessels to your heart.  Using this catheter, doctors can then do diagnostic tests as part of a cardiac catheterization.  Some heart disease treatments, such as coronary angioplasty, also are done using cardiac catheterization."
http://www.mayoclinic.com/health/cardiac-catheterization/MY00218

[5]Vascular studies are a noninvasive (the skin is not pierced) procedure used to assess the blood flow in arteries and veins.

[6]A medication to aid in smoking cessation.

He also assessed longstanding smoking history and hypertension.  Plaintiff decided to proceed with cardiac catheterization which was performed the following day.  Two stents were put in place which resulted in zero blockage in her coronary arteries (Tr. at 215-216).  Her final diagnosis included:

A) Good left ventricular systolic function with an ejection fraction[7] of at least 60%;

B) Distal circumflex and distal right coronary artery stenting. . . .

C) Patient had diffuse 25-30% narrowings throughout her coronary system consistent with longstanding smoking history.

(Tr. at 229, 234).

Plaintiff was put on Plavix "for at least 1 year because of the drug eluting stents. Otherwise, the patient will continue on Aspirin".  Plaintiff was prescribed hypertension medications.  "Chantix will also be offered. . . .  Smoking cessation was urged." (Tr. at 229, 234).

On October 24, 2009, plaintiff saw Andra Fontaine, a nurse practitioner (Tr. at 333-334).  Plaintiff complained of left jaw swelling, chronic constipation, and low back pain with long periods of standing.  Plaintiff was alert, oriented, and in no acute distress;

---

[7]"Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts.  During each heartbeat cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles). When your heart relaxes, the ventricles refill with blood.  No matter how forceful the contraction, it doesn't empty all of the blood out of a ventricle.  The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat.  The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV).  An LV ejection fraction of 55 percent or higher is considered normal."
http://www.mayoclinic.com/health/ejection-fraction/AN00360

her mood and affect were normal; her chest was nontender; her breath sounds were normal; her heart rate was regular with no murmur or gallop; her abdomen was nontender with normal bowel sounds and no organomegaly [abnormal enlargement of organs]; and she had full range of motion in her extremities. X-rays of plaintiff's lumbar spine showed L5-S1 facet joint degenerative changes but no compression fracture, spondylolisthesis,[8] or spondylosis.[9] A head CT showed chronic maxillary sinusitis (sinus infection), mild sclerosis (pathological hardening of tissue), and a 1.2 centimeter mass next to her mandible (lower jaw).

On October 26, 2009, plaintiff was seen by Dr. Sutterer at the Physicians Medical Clinic for treatment of a mass in her jaw (Tr. at 333-334). Plaintiff reported that she had a history of oral cancer (although there are no records reflecting such a finding), and that she was also experiencing lumbago (low back pain) at this appointment. Plaintiff continued to smoke a pack of cigarettes per day. She reported chronic constipation and said she was taking laxatives. She was observed to be oriented times three and her mood and affect were normal. She was referred to an Ear, Nose and Throat specialist for the mass on her jaw.

On November 23, 2009, plaintiff saw Ms. Fontaine for a follow up (Tr. at 331-332). She complained of continued low back pain and said that medication helped with her pain and allowed her to remain active and working. She described her pain as a 1

---

[8]Spondylolisthesis is a condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it.

[9]Spondylosis refers to degeneration of the spine.

on a scale of 1 to 10 "without Darvocet." She continued to smoke one pack of

cigarettes per day. Plaintiff was observed to be alert, oriented and no in acute distress.

Her mood and affect were normal. Her chest was nontender, her heart rate was regular

with no murmur or gallop, her abdomen was nontender with normal bowel sounds and

no organomegaly, and she had full range of motion in her extremities with no

abnormalities in her back. Plaintiff was assessed with lower back pain, a mass on her

face, and constipation. She was told to continue following up with the ENT.

On December 15, 2009, plaintiff saw Robert McDermid, Ph.D., a licenced

psychologist, in connection with her application for disability benefits (Tr. at 241-245).

Dr. McDermid's report reads in part as follows:

> . . . The claimant indicated she does have a driver's license, but does not drive
> because she has no money to afford a vehicle. . . . The claimant was slow to
> rise out of her chair and follow[ed] the examiner with a very slow gait. Ms.
> Pepper was dressed in casual clothing and her hygiene was considered
> appropriate. The claimant appeared to have no significant difficulty sustaining
> eye contact throughout this evaluation. Her speech did not appear to be
> distorted, did not include interruptions of speech melody, and she did not display
> impairment in the production or comprehension of spoken language. Speech
> patterns were mostly relevant and goal directed. There was no evidence of
> psychomotor retardation, hyper-distractibility, or hyperactivity.
>
> Throughout the course of today's interview, Ms. Pepper was observed to exhibit
> a wide range of affect. On some occasions, she appeared anxious, and in other
> situations she appeared to be on the verge of tears. In other circumstances, she
> appeared irritated and angry. . . .
>
> Ms. Pepper stated she has applied for Social Security benefits. According to the
> client, she has been unable to maintain employment because of significant
> medical problems that she is experiencing. She said that the difficulties that she
> has with her heart, kidneys, and bowels make it impossible to work a normal
> work week. She said that her problems are incurable. She said there may be
> medical interventions available to help her with some of these, but she cannot
> afford to get medical help.

\* \* \* \* \*

Ms. Pepper left home when she was sixteen when she got pregnant and married the twins' father. She was married to that man for approximately six years. She was married to another man for approximately two weeks, she was married to her third husband for eleven years, and married to her fourth husband for nine and a half years.[10] She said her third husband went "whacko" and kidnapped and threatened to kill her. He was sentenced to prison for that incident and she divorced him while he was in prison. She said her fourth husband was an alcoholic and she finally just got fed up with him. She is currently living with her brother-in-law's mother. Ms. Pepper moved in with this older woman to watch over her. Prior to that, she was living alone in a camper. . . .

. . . She quit school in the eleventh grade, when she became pregnant. She noted that she completed her GED while in prison. . . .

When asked about her work history, she stated, "I have had lots of jobs." She indicated that prior to becoming ill, she worked when she had to. By this, she meant that two of her husbands made enough income that she was pretty much a full-time housewife. . . .

. . . She said she also has had a history of cancer of the colon and cancer in her mouth. . . .

Ms. Pepper denied any mental health needs during the course of this interview. However, in referral information it is indicated that she suggested to Disability Determinations that she is depressed. She did indicate that she took Valium while she was in prison. She said that prison life "freaked me out." She said that she needed the medication in order to survive. She said she has used no other mental health medications, and has never received counseling or inpatient treatment for mental health issues. . . . She sleeps most of her spare time. She reports that her sleep is disturbed both by nightmares and night terrors. Nightmares and night terrors appear to be related to her kidnapping. . . . She said that she left her third husband after he confided in her that he had had sex with his mother. She said he went crazy after she moved out. She said that she had then moved from place to place to hide from him. Ultimately he came to her workplace with a sawed-off shotgun, and forced her into a vehicle, where he drove in such a manner that she was convinced she was going to die as a result of his driving. Ultimately, he took her to a mountaintop and raped her. The whole time, he was threatening to kill her. After a period of time he asked her to kill

---

[10]I note that in her application for Social Security benefits, plaintiff reported only one marriage (Tr. at 107).

him, which she refused to do. Ultimately, she got away from him and returned to her workplace, whereupon the police made her return to the mountaintop, where she expected to find him with a shotgun blast through his head or chest. However, he had not killed himself, and when he was arrested, he told her he would kill her. She stated that he will be in prison for a long time, but she believes that if he ever sees her again, he will kill her. Another complication of this event is the emotional distress she continues to have in sitting in a passenger seat of a vehicle. She said it used to make her throw up merely to be in the passenger seat of a car. While she does not do that now, she is extremely uncomfortable. This is extremely difficult for her now that she does not drive for herself. She stated ths is one of the reasons that she stays at home much of the time.

Ms. Pepper indicates that she used to drink, but never had a problem with it. She stated she has not had any alcoholic beverages for the past four to five years. She stated that she has used marijuana in the past and still would enjoy using marijuana, but has not used it for over a year.

. . . [H]er first husband faked his death in order to get government benefits, and she was found guilty of being a part of this crime. She was convicted of filing false statements and spent thirteen months in prison and had two years of parole. She had one other conviction that was related to "stealing a handful of buttons" from a boarded-up store.

. . . The claimant's remote memory was adequate. . . . Insight and judgment were within normal limits. . . . Abstract thinking was considered to be adequate. . . . Her fund of knowledge was intact. . . . Intellectually it appears Ms. Pepper is functioning in the average range.

Axis I          Post-Traumatic Stress Disorder
                Adjustment Disorder, with Depressed Mood
Axis II         No diagnosis, Borderline Personality Features

* * * * *

Axis V          GAF: 52

* * * * *

The specific referral questions are addressed below: . . . The client's maximum remaining ability to understand and remember instructions would likely be in moderately complex tasks. . . . Ms. Pepper performed extremely well on most of the tasks of the mental status exam. . . . [H]er maximum remaining ability to sustain concentration is believed to be adequate in moderately complex tasks.

In terms of persistence, there is some concern about physical endurance with reports of fatigue. It is unclear whether this fatigue is related to physical health concerns or possible depression. . . . While the client said she does not like people, it is clear from her interactions in the present evaluation that she can respond appropriately when necessary. . . . [T]here are certain occupations where she could have limited interactions with others and limited social stress where she might be successful.

(Tr. at 241-245).

On December 21, 2009, plaintiff saw Ms. Fontaine for a follow up (Tr. at 329-330). She said that her lower back was doing better and that medication helped with pain control which allowed her to be active. She did not report any medication side effects. She continued to smoke one pack of cigarettes per day. Her abdomen was nontender with no organomegaly and normal bowel sounds. Her back was normal, she had full range of motion in her extremities with no tenderness. She was observed to be oriented times three with normal mood and affect. She was told to follow up in three months.

On March 9, 2010, plaintiff saw Ms. Fontaine with complaints of a rash on her hands after doing some cleaning with lots of chemicals (Tr. 327-328). Plaintiff continued to smoke one pack of cigarettes per day. Plaintiff was alert, oriented, and in no acute distress, her mood and affect were normal, her chest was nontender, her breath sounds were normal, her heart rate was regular with no murmur or gallop, her abdomen was nontender with normal bowel sounds and no organomegaly, and she had full range of motion in her extremities with no abnormalities in her back. She was given Triamcinolone, which is a steroid cream used to relieve redness, itching, swelling, or other discomfort caused by skin conditions.

On April 21, 2010, plaintiff saw Larry Deffenbaugh, D.O., complaining of "perirectal soiling as well as intermittent fecal incontinence over the last two years." (Tr. at 247-248). Plaintiff reported that she may go three to five days without a bowel movement, and that for a number of years she had one bowel movement per week. "Currently she has a bowel movement within 1 1/2 hours of meals and those stools are urgent, somewhat explosive and are commonly associated with fecal incontinence." Plaintiff had had five colonoscopies in the past all due to colonic polyps. A polyp found in 1990 was cancerous. Plaintiff reported having gained 30 pounds during the past year. She weighted 213 pounds on this date. She continued to smoke one pack of cigarettes per day. Dr. Deffenbaugh ordered a colonoscopy.

Plaintiff had a colonoscopy on April 28, 2010, and an esophagoduodenoscopy[11] on April 30, 2010 (Tr. at 251-266, 268-284). Results showed nonspecific proctitis,[12] mild to moderate inflammation, chronic gastritis[13] rule out hypochlorhydria,[14] and gastritis with intestinal metaplasia.[15] A post-procedure follow-up telephone call on May

---

[11]Examination of the pharynx, esophagus, stomach, and duodenum.

[12]Inflammation of the lining of the rectum which is the terminal portion of the large intestine, extending from the sigmoid colon to the anal canal.

[13]Gastritis describes a group of conditions with one thing in common: inflammation of the lining of the stomach. The inflammation of gastritis is often the result of infection with the same bacterium that causes most stomach ulcers. However, other factors — such as injury, regular use of certain pain relievers or drinking too much alcohol — also can contribute to gastritis. http://www.mayoclinic.com/health/gastritis/DS00488

[14]Low stomach acid.

[15]Intestinal metaplasia (IM) of the gastric mucosa is a relatively frequent precancerous lesion. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2895407/

3, 2010, showed that plaintiff had no nausea, vomiting, headache, sore throat, or difficulty voiding, and she had returned to her normal activities of daily living (Tr. at 254).

On May 12, 2010, plaintiff saw a nurse practitioner to discuss the consult letter from Dr. Deffenbaugh (Tr. at 325-326). She continued to smoke one pack of cigarettes per day. Plaintiff denied chest pain, breathing trouble, abdominal pain, nausea, vomiting, diarrhea, bloody stools, frequent urination, double vision, difficulty walking, back pain and leg pain. Her physical exam was normal. She was alert and oriented, her mood and affect were normal, her back was normal, her extremities were nontender with normal range of motion. She was diagnosed with gastroesophageal reflux disease ("GERD") and ileitis[16] and was prescribed Omemprazole[17] and Mesalamine.[18]

On June 16, 2010, plaintiff saw a nurse practitioner for a follow-up (Tr. at 323-324). She continued to smoke one pack of cigarettes per day. Plaintiff reported some nausea but said that Mesalamine had resolved her lower rectal and bowel problems (Tr. at 324). Plaintiff was alert, oriented and in no acute distress; her mood and affect were normal; her chest was nontender; her breath sounds were normal; her heart rate was regular with no murmur or gallop; her abdomen was nontender with normal bowel sounds and no organomegaly; she had full range of motion in her extremities; and she had no abnormalities in her back. She was again assessed with GERD and ileitis and

---

[16]Inflammation of the ileum, a portion of the small intestine.

[17]Reduces stomach acid.

[18]Treats ulcerative colitis.

her prescriptions were refilled.

On July 7, 2010, plaintiff filed her application for Social Security disability benefits claiming she had been disabled since September 23, 2009.

On July 17, 2010, plaintiff saw a nurse practitioner complaining of cold symptoms (Tr. at 321-322). On exam her heart was normal, abdomen was non tender with no organomegaly and normal bowel sounds, her back was normal, her extremities were normal with full range of motion, she was oriented times three with normal mood and affect. She reported having GERD again. Her medications were continued.

On August 30, 2010, plaintiff was seen by Dewey Ballard, M.D., for a consultative exam in connection with her application for government benefits (Tr. at 337-339, 340-342).

> This lady's chief complaint is a history of coronary artery disease. Last year she began experiencing exertional chest pain. She had an abnormal stress test and subsequently underwent heart catheterizations. She had two stents placed. She states she did well for several months after that, but approximately three months ago she began experiencing recurrence of her chest pain.
>
> . . . She does not associate [the chest pain] with exertion. She is currently experiencing one to three episodes of chest pain weekly. These episodes last approximately 10 minutes and are relieved with rest. She recently saw her cardiologist and he has scheduled another stress test. He told her he thought one of the stents had occluded.
>
> This lady has also been diagnosed with chronic bronchitis. She states she has a daily productive cough usually in the morning. She has had multiple antibiotics over the years. She states she is dyspneic [short of breath] after walking approximately one block or one flight of stairs. This has been present for several years.
>
> When the patient was working, she was experiencing low back pain. Now that she is no longer working, the back pain is not bothering her as much. The pain occurs with lifting and bending activities, as well as prolonged standing.

* * * * *

[P]ositive for frequent headaches. . . . Her weight has been stable.[19]  She is not having abdominal pain currently.  She has had no recent change in bowel habits. . . .

This lady last worked in February of 2010.  She was working in a deli. The job required frequent heavy lifting and she could not do the work.  She smokes one pack of cigarettes per day.  She denies heavy alcohol use. She lives with a boyfriend.  She has been working part-time as a [c]leaning lady at a church.  She states she only makes approximately $30.00 per week.

Examination reveals a lady with a normal affect.  Her communication skills are good. She is able to rise from a chair without difficulty. Her gait is normal.  She is able to get on and off the examination table without problems. . . .  Heart sounds are regular.  There is no murmur. The abdomen is not tender.  There is no organomegaly.  She has full range of motion of the knees. . . .  She has a full 90° of flexion of the lumbar spine.  Straight leg raising signs are negative bilaterally. . . .

IMPRESSION:
1.      Coronary artery disease.  I suspect her current chest pain is angina. This is occurring with moderate amounts of activity.  She would have difficulty currently doing jobs requiring prolonged walking or standing.  She would have difficulty doing moderate to heavy lifting.
2.      Probable COPD [chronic obstructive pulmonary disease].  Spirometry could better define the severity of her breathing problem.
3.      Low back pain with normal examination.
4.      Hypertension.

Currently this lady would have difficulty doing jobs requiring significant lifting or prolonged walking.  She would have difficulty going up steps and walking up hills.  Her communication skills are good. . . .

Plaintiff had normal range of motion in her shoulders, elbows, wrists, knees, hips,

cervical spine, and lumbar spine.  She had normal grip strength, normal upper extremity

strength, and normal lower extremity strength.  There were no abnormal findings in Dr.

Ballard's examination (Tr. at 338-339).

_____

[19]Four months earlier she reported a 30-pound weight gain.

Three days later, on September 2, 2010, plaintiff underwent a stress echo-cardiogram (Tr. at 348-349). She had to stop after 3 minutes and 19 seconds of exercise due to fatigue. The impressions included "negative stress echo."

On September 13, 2010, plaintiff saw Dr. Deffenbaugh for a follow up (Tr. at 372). Plaintiff had seen Dr. Deffenbaugh five months earlier. On this occasion, plaintiff said she had done well on Mesalamine but had been "off" and was soiling again. Dr. Deffenbaugh told her to "resume Mesalamine" and return in three months.

On September 30, 2010, Steven Akeson, Psy.D., reviewed the record and completed a Psychiatric Review Technique (Tr. at 351-362). He found that plaintiff had an adjustment disorder with depressed mood, PTSD, and borderline personality disorder traits. It was his opinion that plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent alleged because none of her treating sources noticed or commented on any of her mental symptoms (Tr. at 361). He also believed that the level of severity assessed by Dr. McDermid was not credible for the same reason and that Dr. McDermid had given plaintiff the "full benefit of the doubt."

Dr. Akeson completed a Mental Residual Functional Capacity Assessment and found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

On November 23, 2010, plaintiff was evaluated by Jennifer Alberty, Psy.D., in connection with an application for government benefits from the Jasper County Family Support Division (Tr. at 374-378). Dr. Alberty conducted a clinical interview, mental status exam, and personality assessment inventory. "As no records were available for review, all information was obtained from Ms. Pepper" (Tr. at 374). Plaintiff was driven to the appointment by her boy friend. Plaintiff presented a new complaint: "I have no patience anymore. People aggravate me." She also, for the first time, reported suicidal ideation.

Plaintiff reported that she quit school after tenth grade and that she got married to get out of the house. Plaintiff described her four marriages and then said that she had been in her current relationship for nine months. "She described her boy friend as 'dumber than a box of rocks. I hate to say it, but he is in his second childhood and he doesn't have any brain.'" Plaintiff described her hobbies as "playing the lottery and being on the internet." Plaintiff described her employment history as having had approximately 30 jobs with the longest lasting two years. She did not report her long periods of unemployment and reliance on her former husbands for income; however, she admitted, "She has no current income and is being supported by her boyfriend."

Plaintiff reported previous use of marijuana and said, "I like it, but I haven't had any in two years." Plaintiff was convicted of defrauding the government and spent 13 months in prison and then was on parole for two years. She was arrested again at age 28. She claimed that she was riding in a car with a former husband and a friend, and

the two of them stopped at an abandoned building and took some steel. "We didn't know we couldn't take it."

During the Personality Assessment Inventory, plaintiff reported difficulty controlling her physical responses to frustration and "significant difficulty with communication and self expression." Based on plaintiff's reports of symptoms, Dr. Alberty assessed major depressive disorder, single episode; and post traumatic stress disorder. She assigned a GAF of 45.

> Ms. Pepper is eligible for Medical Assistance. It appears the client is experiencing emotional dysfunction at a severity that would preclude her from employment.

> On March 18, 2011, plaintiff went to the emergency room with complaints of left leg and buttock pain (Tr. at 388-390). A lower extremity venous Doppler study showed no visible evidence of deep femoral or superficial venous thrombosis (blood clot). Plaintiff was diagnosed with sciatica[20] and sacroiliitis[21] and given prescriptions for Lortab (narcotic) and Flexeril (muscle relaxer).

---

[20]"Sciatica refers to pain that radiates along the path of the sciatic nerve -- which branches from your lower back through your hips and buttocks and down each leg. Typically, sciatica affects only one side of your body. Sciatica most commonly occurs when a herniated disk or a bone spur on the spine compresses part of the nerve. This causes inflammation, pain and often some numbness in the affected leg. Although the pain associated with sciatica can be severe, most cases resolve with just conservative treatments in a few weeks." http://www.mayoclinic.com/health/sciatica/DS00516

[21]"Sacroiliitis is an inflammation of one or both of your sacroiliac joints -- the places where your lower spine and pelvis connect. Sacroiliitis can cause pain in your buttocks or lower back, and may even extend down one or both legs. The pain associated with sacroiliitis is often aggravated by prolonged standing or by stair climbing. . . . Treatment of sacroiliitis may involve a combination of rest, physical therapy and medications." http://www.mayoclinic.com/health/sacroiliitis/DS00726

On June 17, 2011, plaintiff saw Bradford Garner, M.D., to establish care (Tr. at 398-399). Plaintiff reported having smoked one pack of cigarettes per day for the past 38 years.[22] Plaintiff denied fatigue, cough, shortness of breath, chest pain, exertional chest pain or discomfort, abdominal pain, change in bowel habits, constipation, diarrhea, reflux symptoms, and indigestion. Plaintiff's physical exam was entirely normal. She was assessed with chronic low back pain and was continued on her medications.

On July 20, 2011, plaintiff returned to see Dr. Garner and reported bluish color in her fingers and toes which was similar to before she had stents put in (Tr. at 399, 403). The Ultram Dr. Garner had prescribed on the last visit made her itch, so she stopped taking it and now reported that her pain was not well controlled. She was using only over-the-counter Tylenol for her back pain. Plaintiff was experiencing no shortness of breath and no chest pain. Her physical exam was entirely normal. Additionally, Dr. Garner observed that plaintiff's mood and speech were appropriate, her judgement and insight were intact. Dr. Garner ordered an EKG and suggested "positional problem in regards to extremity color and temp change". He told her to follow up in about a month.

---

[22]On September 23, 2009, plaintiff had told her cardiologist, Dr. Nicholas, that she had cut down from two packs per day to one pack per day. Yet in July 2009 when she went to the emergency room she reported smoking one pack per day. For whatever reason, plaintiff apparently wanted her cardiologist to believe she was attempting to cut down on smoking when in reality she had been smoking the same amount for most of her life.

## C.    SUMMARY OF TESTIMONY

During the August 22, 2011, hearing, plaintiff testified as follows.  At the time of the hearing plaintiff was 55 years of age and was 53 at the time she applied for benefits (Tr. at 32-33).  She went to school through 12th grade but did not graduate although she earned a GED (Tr. at 33).

Plaintiff worked part time from September 2009 through the first half of February 2010 at the country Fresh Market and Grocery (Tr. at 34).  She cleaned the equipment and cooked food to put in a buffet table (Tr. at 34).  Plaintiff worked 20 hours a week for minimum wage (Tr. at 34).  Plaintiff left that job because she "kept going to the bathroom on [her]self" and half the time the bathroom was not working and she would not be allowed to go home to clean up (Tr. at 35).  She was on Plavix because of her heart, and when she cut herself on the machinery it took two hours for the bleeding to stop, so she quit[23] (Tr. at 35).  Plaintiff has had the issue with defecating on herself for about six years, but she did not see a doctor about it until recently (Tr. at 35).

Prior to 2004, plaintiff did not work much (Tr. at 35).  "I was married and as long as he could pay the bills I didn't have to work." (Tr. at 35).  Plaintiff and her husband divorced because of his alcoholism (Tr. at 35).  After she started working in 2004, she got kicked by a cow (at the stock yard where she worked) and "it snowballed into everything going wrong at one time." (Tr. at 35).  That smashed a major vein in her right leg and she started having "excruciating" chest pains (Tr. at 35-36).  Plaintiff went to the

---

[23]This conflicts with what she told Dr. Ballard, i.e., that she quit the deli job because she could not do the required lifting.

emergency room over and over but was told there was nothing wrong with her heart, that it was her blood pressure (Tr. at 36).  Every two weeks her doctor was changing her blood pressure medicine, and her body went crazy and got worse (Tr. at 36).

Eventually plaintiff had two stents put in, but she still has chest pain about once a week if she overexerts herself (Tr. at 36).  Walking about halfway around a Wal-Mart store consists of overexertion, and while walking around Wal-Mart she usually soils herself (Tr. at 37).   She has to sit down to catch her breath and to try to calm herself down (Tr. at 36).  Plaintiff is not taking any medication now for her heart -- she asked to be taken off Plavix because she was bruising easily so now she takes one aspirin a day (Tr. at 36).

Plaintiff soils herself at least twice a day four days a week, even with taking medication (Tr. at 37, 39).  She has no warning and she does not even feel it happening (Tr. at 37).  Plaintiff had an upper GI and a colonoscopy and then she was prescribed medication for a defect in the lining of her stomach and an inflamed ileum and lower bowel -- but the medication is not doing any good (Tr. at 38).  Plaintiff uses the bathroom about six times a day, but on days when she soils herself she uses the bathroom about twice a day (Tr. at 39-40).  She uses the bathroom six times a day one or two days a week (Tr. at 40).  Plaintiff testified that she had not been to see her gastroenterologist since the tornado hit three months earlier because it destroyed his building and she no longer knows where he is (Tr. at 47).

Plaintiff has suffered with back problems for at least six years (Tr. at 38). Standing for too long causes excruciating pain in her lower back (Tr. at 38).  Sitting for

too long causes pain and also makes her stiff, and she has to get up and move around (Tr. at 38).  Plaintiff can stand for about 40 minutes at a time, and she can sit for about an hour at a time (Tr. at 38).  Plaintiff can walk about halfway around a Wal-Mart store before needing to sit down (Tr. at 38). This also causes her to have chest pains and soil herself (Tr. at 38-39).

Plaintiff can carry a gallon of milk or a 24-pack of soda only for a short distance (Tr. at 39).  Lifting anything heavier causes her back to hurt and she has to sit down to rest (Tr. at 39).

Plaintiff is not being treated for any mental health problems, although she has asked her primary care doctor to refer her to a psychologist (Tr. at 40).  She is not taking any type of psychiatric medications because she turned them down (Tr. at 40).  She is trying to deal with it on her own instead of taking medication (Tr. at 40).  Plaintiff has anxiety and panic attacks when she rides in the car; and ever since the tornado three months earlier, she has a panic attack when the wind starts blowing (Tr. at 40, 41).  Plaintiff testified that her house fell down on her in the tornado and she was required to move in with her boy friend (Tr. at 41).  She currently lives with her boy friend (Tr. at 41).  She later testified that she had already been living with her boy friend and it was actually his house that was blown down by the tornado (Tr. at 45).

Plaintiff has a driver's license, but she does not drive because she "freaks out" (Tr. at 41).  She goes out about twice a week and at those times she rides in a car (Tr. at 41).

Plaintiff and her boy friend split the household chores (Tr. at 42). They both do dishes by alternating working on the dishes and taking breaks (Tr. at 42). Plaintiff does not vacuum much because it hurts her back (Tr. at 42). On good days, she can do laundry (Tr. at 42). Currently plaintiff does not need any assistance "yet" with any activities around the house (Tr. at 42). However, two or three days a week, she leaves her chores without doing them because she is in too much pain (Tr. at 42).

On a bad day, plaintiff stays in her bed and sleeps all day (Tr. at 43). This is due to depression and pain (Tr. at 43). On a good day, she gets up and eats donuts, does some laundry, runs over to Wal-Mart with her boy friend[24] to buy some groceries, and then just stays at home the rest of the day (Tr. at 43).

In addition to needing to sit down and rest, experiencing chest pains, and soiling herself when she walks around Wal-Mart, plaintiff also has to write everything down when she is there because her memory is not very good (Tr. at 43). She will try to minimize what she buys, wait a day, and then go back again to buy some more (Tr. at 43-44).

Plaintiff does not need any assistive devices (Tr. at 44). Her blood pressure medication does not work (Tr. at 44). She does not know whether she experiences side effects from medication because she is "not used to medications. I have always been on herbal drugs since I had my stents put in." (Tr. at 44). Plaintiff later said that she takes Atenolol for her heart racing and that makes her dizzy (Tr. at 44). She cannot

---

[24]Plaintiff did not explain why, if walking around Wal-Mart gives her chest pain and she soils herself while she is there, her boy friend does not do the shopping alone.

crawl, she cannot climb a ladder (Tr. at 44).  After two hours she is supposed to lie down for 15 minutes (Tr. at 44).  Her heart doctor told her that (Tr. at 44).  Plaintiff has chest pain two to three times a week when she walks too much (Tr. at 46).  Plaintiff does not have a prescription for nitroglycerin because she is allergic to it (Tr. at 46).

Plaintiff's boy friend is retired (Tr. at 45).  Prior to retiring in December 2010, her boy friend worked as a custodian for the Joplin School District (Tr. at 46).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Melvin Werner entered his opinion on October 27, 2011 (Tr. at 12-24).

Step one.  Plaintiff has not engaged in substantial gainful activity since July 7, 2010 -- her application date (Tr. at 14).  Plaintiff worked after her application date as a deli attendant from September 2009 until February 2010, but that work did not rise to the level of substantial gainful activity.

Step two.  Plaintiff has the following severe impairments:  coronary artery disease, degenerative lower lumbosacral facet joints, post-traumatic stress disorder, adjustment disorder with depressed mood, and borderline personality features.  Plaintiff alleged bowel incontinence; however, because the condition is well controlled with medication and does not cause more than minimal functional limitations, it is not a severe impairment (Tr. at 14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four.  Plaintiff retains the residual functional capacity to perform medium work which includes lifting and carrying 50 pounds occasionally and 25 pounds frequently, acquire and retain at least moderately complex and most likely complex instructions, sustain concentration and persistence with at least moderately complex tasks and most likely complex tasks, and adapt to normal changes in a workplace environment (Tr. at 16).  With this residual functional capacity, plaintiff can perform her past relevant work as a convenience store/deli attendant (Tr. at 23).  Therefore, plaintiff is not disabled (Tr. at 24).

## VI.    OPINIONS OF EVALUATORS

Plaintiff argues that the ALJ erred in giving too much weight to the opinion of a non-examining psychologist and failing to give significant weight to the opinions of Dr. Alberty and Dr. McDermid, both psychologists who examined plaintiff one time in connection with applications for government benefits.  She also argues that the ALJ erred in finding that she can lift 25 pounds frequently and 50 pounds occasionally.

Dr. McDermid indicated that his sources of information were "clinical interview, file review, mental status exam".  It is unclear what was in the file he reviewed -- if it was any of plaintiff's medical records, he did not mention them in his five-page, single-spaced report.  Nothing was referred to in his report that was not based on plaintiff's own allegations during that one visit.  Dr. Alberty's report specifically states, "As no records were available for review, all information was obtained from Ms. Pepper."  Dr. Ballard's physical examination of plaintiff was normal, but he noted that due to coronary

artery disease (which plaintiff reported but did not have), she would have difficulty doing moderate to heavy lifting.

Because all of these opinions were based on nothing more than plaintiff's subjective reports of her symptoms, her credibility is necessarily an issue even though plaintiff did not challenge the ALJ's finding that plaintiff's subjective complaints are not credible.

The ALJ had this to say about all of the mental health experts who provided an opinion:

> In regards to mental impairment, the claimant alleged she has anxiety attacks when she rides in the car and since the tornado in May 201[1], she also has anxiety attacks when the wind picks up. The claimant testified on a bad day she stays in bed all day due partly to pain, partly to depression.
>
> However, the record shows little support for these claims. The claimant is not receiving any mental health treatment and is not taking any psychiatric medications. Treatment records provided by Freeman Hospital indicate no psych findings and neurological exam was normal. Kent Sutterer, D.O., treatment notes consistently document normal mood/affect. St. John's Hospital noted psych negative. At her physical consultative exam with Dr. Ballard there were no psych complaints, findings or treatment noted.
>
> The claimant was seen for a consultative psychological evaluation with Robert McDermid, Ph.D., on December 15, 2009. During the course of the interview, the claimant denied any mental health needs. She described a history of family abuse, rape, and kidnapping but denied any history or counseling or inpatient treatment for mental health issues. She indicated she took Valium while in prison during a period of incarceration . . . because prison life "freaked her out". The claimant was noted to have good eye contact; full range of affect, but on some occasions appeared anxious or tearful. Intellectual functioning appeared to be in the average range. The claimant arrived on time, demonstrated understanding and purpose for the evaluation, and related with examiner and answered questions appropriately. The mental status did not reflect any difficulties with memory or comprehension. In fact, she performed extremely well on most of the tasks. She successfully followed a simple, three-step command. She was successful at responding to examiner prompts and her speech was not

derailed or circumstantial. Dr. McDermid diagnosed post traumatic stress disorder (PTSD); adjustment disorder with depressed mood and borderline personality features, with a GAF of 52.

In connection with an application for medical assistance, the claimant was seen for psychological evaluation with Kevin Whisman, Psy.D., on August 17, 2009, and Jennifer Alberty, Psy.D. November 23, 2010. Dr. Whisman diagnosed post traumatic stress disorder and gave the claimant a global assessment of functioning of 48. Dr. Alberty diagnosed major depressive disorder, single episode and PTSD. She gave the claimant a GAF of 45. Although the claimant was found to be experiencing emotional dysfunction at a severity that would preclude her from employment by these two examining sources, this was based largely on self-report. In both instances, it was noted that no records were available for review and that all information was obtained from the claimant. The clinical interviews were generally unremarkable and her PAI [Personality Assessment Inventory] with Dr. Whisman suggested possible intentional exaggeration of complaints and problems.

While the undersigned has considered the claimant's testimony of limitations from her mental impairments, the overall record simpl[y] does not support the level of difficulty she now alleges. The only medical records reflecting any sort of mental difficulties are the consultative psychological evaluations. However, as discussed above, the undersigned finds the opinions of Dr. Whisman and Dr. Alberty to be unreliable. Similarly, the level of difficulty indicated by the GAF of 52 assigned by Dr. McDermid lacks support from the evidence considered as a whole.

Treating sources have not noticed or commented on any mental difficulties. The claimant has not sought any treatment for these alleged problems, not even in conjunction with her physical conditions. There is no indication of any problems completing activities of daily living or caring for herself. Treatment notes do not reflect ongoing anxiety attacks or an inability to get along with others. The claimant's consultative examinations establish mental impairments that more than minimally affect her ability to perform basic mental work-related activities, but the objective evidence when considered with the broader medical record does not document a level of severity consistent with the claimant's allegations of disability.

\* \* \* \* \*

As for the opinion evidence regarding the claimant's mental impairments, as explained above, the undersigned finds the opinions of Dr. Whisman and Dr. Alberty to be unreliable. Their opinions were based largely on claimant's self-

report and the clinical interviews were generally unremarkable. The determination whether a claimant is able to work is an administrative finding reserved to the Commissioner of the Social Security Administration. The opinion of a medical source as to this determination cannot be given special significance (Social Security Ruling 96-5p). Because Dr. Whisman and Dr. Albert[y]'s opinion lacks support from treatment notes or objective findings and is not consistent with the other evidence of record, the undersigned has afforded their opinions little weight.

Similarly, the level of emotional impairment indicated hy Dr. McDermid in assigning a GAF of 52 also lacks support from the evidence considered as a whole. Treating sources have not noticed or commented on any mental difficulties and the claimant has not sought any treatment for these alleged problems, not even in conjunction with her physical conditions. As noted above, there is no indication in treatment records of any problems completing activities of daily living or caring for herself. They do not reflect ongoing anxiety attacks or an inability to get along with others. Also, GAF scores include consideration of non-medical factors such as personal or financial circumstances and may not, standing alone, be a basis on which to determine mental or emotional deterioration.

In his summary and recommendations, Dr. McDermid opined that the claimant's maximum remaining ability to understand and remember instructions would likely be in moderately complex tasks and her maximum remaining ability to sustain concentration is adequate in moderately complex tasks. He further noted that although the claimant said she does not like people, it was clear from her interactions in his evaluation that she can respond appropriately when necessary. Dr. McDermid found job environments that require a great deal of social interaction not appropriate for the claimant. This opinion is given only partial weight. The limitations noted by Dr. McDermid appear to give the claimant the full benefit of the doubt. Although the claimant has complained of problems getting along with others, there is no independent basis for this and her reported activities, such as attending church activities regularly, having monthly cookouts with friends, going out to eat with her friend as well as her part-time work as a deli attendant, indicate to the contrary.

More weight is given to Steven Akeson, Psy.D., who completed a psychiatric review technique and mental residual functional capacity assessment at the request of the state agency. Dr. Akeson did not examine the claimant, but based the opinion on a review of the claimant's records. The MRFC [mental residual functional capacity] assessment indicates the claimant is moderately limited in her ability to understand, remember and carry out detailed instructions. With these limitations, Dr. Akeson opined the claimant is able to acquire and retain at

least moderately-complex and most likely complex instructions and sustain concentration and persistence with at least moderately complex tasks and most likely complex tasks. This opinion is well supported by the findings of the evaluation with Dr. McDermid and her reported activities and has been given significant weight. On the psychiatric review technique, Dr. Akeson indicated only mild difficulties in maintaining social functioning, but found the claimant moderately limited in ability to interact appropriately with the general public or get along with coworkers. This limitation appears consistent with the opinion of Dr. McDermid which was based on the claimant's report, but lacks any support from the medical record and is inconsistent with her reported activities. As a result, the social limitations are given little weight by the undersigned.

The record supports the ALJ's findings with regard to the opinions of the mental health experts. Plaintiff's medical records establish that she complained of and exhibited no mental health concerns when being seen for treatment -- the only time she raised mental health issues was when she was being evaluated for government benefits.

On July 18, 2009, plaintiff went to the emergency room for double vision. She denied any psychological problems including post traumatic stress disorder that she later (in connection with benefits applications) said disabled her and was based on an event that occurred well before the 2009 emergency room visit. In fact, less than one month after her emergency room visit, plaintiff saw Dr. Whisman in connection with an application for benefits and she said she was disabled from doing any job due in part to anxiety attacks, paranoia, inability to be in traffic, depression "for a long time," frequent crying spells, and trouble sleeping. This is completely inconsistent with her ER treatment records.

She told Dr. Whisman she had a history of multiple head injuries, loss of consciousness, and concussion. However, she never disclosed this history to any

treating doctor, ever.

She told Dr. Whisman she had a history of receiving psychological services to include individual psychotherapy. Yet she told Dr. McDermid that she has never received treatment (including medication or counseling) for mental health issues.

Dr. Whisman concluded that plaintiff had exaggerated certain problems, that she reported "particularly bizarre and unlikely symptoms," that she may have intentionally exaggerated complaints and problems, and that she expressed an interest in seeking employment if her heart could handle it. However, when she subsequently was told that her heart was fine, plaintiff did not act on that alleged desire to seek employment.

Dr. Whisman, who saw plaintiff in August 2009 in connection with an application for government benefits, told plaintiff that a combination of pharmacotherapy and psychotherapy would be successful in treating her reported conditions and she was "strongly encouraged" to seek those supports. She did not. Plaintiff never sought any mental health treatment, claiming either that she could not afford to or that she had no transportation to such treatment, yet she could afford to smoke a pack of cigarettes per day against all medical advice, and she was able to get to and from (and afford) medical appointments for things as minor as cold symptoms and a skin rash.

Plaintiff told Dr. McDermid, in connection with an application for benefits, that she had "incurable" problems with her heart, kidneys and bowels and those problems made it impossible for her to work. This directly contradicts plaintiff's treatment records.

Plaintiff told Dr. Alberty in November 2010, again in connection with her benefits application, that she was experiencing suicidal ideation, and that she was having

significant difficulty with communication and self expression and significant difficulty with controlling physical responses to frustration. However, she never reported this to any other medical professional and none of these problems was ever observed by any doctor.

In addition to plaintiff's conflicting reports with regard to her mental health condition, she also contradicted herself in other aspects. For example, she testified at the hearing that she went to school through 12th grade, she told Dr. Whisman she completed only the 10th grade, and she told Dr. McDermid that she quit in the 11th grade.

She told Dr. Whisman that she had to quit high school because the school was closed after "it" was caught embezzling. She told Dr. McDermid that she quit school because she got pregnant.

She told Dr. Whisman that she completed vocational training in broadcasting but she reported in her administrative paperwork that she was trained in small appliance repair.

She told the doctors in connection with her application for benefits that she had been married four times, but she only disclosed one marriage in her application for Social Security disability.

Plaintiff has a felony conviction for trying to defraud the government. In addition, she admittedly used marijuana as late as December 2008 and said she liked using it. She told Dr. McDermid that she was arrested for "stealing a handful of buttons" but told Dr. Alberty she was arrested for steeling steel.

Plaintiff told Dr. Nicholas, who was treating her for chest pain, that she had cut down smoking by a pack a day which was clearly false as the records show that she smoked the same amount for at least 38 years. She had been given a prescription for Chantix to help her stop smoking, but she never even filled the prescription.

Plaintiff told Dr. McDermid that she did not drive because she "has no money to afford a vehicle." She testified at the administrative hearing that she does not drive because she suffers from post traumatic stress syndrome and has panic attacks.

Plaintiff told Dr. McDermid that she was living with her brother-in-law's mother and previously lived alone in a camper. However, in her application for Social Security, which was completed before this visit with Dr. McDermid, and in her testimony, which occurred after this visit with Dr. McDermid, she said she lived with her boy friend.

Plaintiff reported that she only worked when she had to -- that she lived off her husbands' earnings in the past, she was living off her current boy friend whom she described as "dumber than a box of rocks," she was convicted in the past of attempting to defraud the government, and this suggests that plaintiff's motivation for collecting income from yet another source is not based on a physical or mental inability to earn a living by working. One of her hobbies was playing the lottery.

Plaintiff told Dr. Deffenbaugh in April 2010 that she had been experiencing perirectal soiling and fecal incontinence over the last two years. However, less than six months earlier she was taking laxatives. By the end of the month after seeing Dr. Deffenbaugh once, plaintiff reported that she had returned to her normal activities of daily living. The following month when she saw Dr. Deffenbaugh for a follow up, she

denied chest pain, breathing trouble, abdominal pain, nausea, vomiting, diarrhea, bloody stools, frequent urination, double vision, difficulty walking, back pain and leg pain. Her physical exam was normal. She was alert and oriented with normal mood and affect, her back was normal, her extremities were nontender with normal range of motion.

In June 2010, plaintiff said that Mesalamine had resolved her bowel problems. She was alert and oriented with normal mood and affect. She had full range of motion in her extremities and no abnormalities in her back.

In July 2010, plaintiff's exam was again normal, including her heart, abdomen, bowel sounds, back, extremities, mood and affect. She complained of nothing other than cold symptoms and GERD. Despite this, the following month plaintiff told Dr. Ballard -- in connection with an application for government benefits -- that she had been experiencing chest pain for the past three months. It is not plausible that plaintiff would seek medical care in July 2010 for cold symptoms and not mention the fact that she had been experiencing chest pain for the past two months. This is another example of exaggeration when being seen for benefits as opposed to being seen for treatment.

Plaintiff also told Dr. Ballard -- in connection with benefits -- that her cardiologist told her he thought one of her stents had occluded. No such thing had happened. She claimed she had been diagnosed with chronic bronchitis. Not only does this not appear in any medical records, it would be irrelevant given plaintiff's continued smoking against medical advice. She told Dr. Ballard she had been experiencing shortness of breath after walking only a block and that this had been present for several years. Yet, over the

past several years she consistently denied shortness of breath to her <u>treating</u> doctors. And plaintiff continued to smoke.  Plaintiff told Dr. Ballard she was working part time as a cleaning lady at a church and she testified she worked at a deli (both in 2010); however, plaintiff never reported these earnings to the government.  Plaintiff's affect was normal, her communication skills were good, her gait was normal, she was able to get up from a chair and on and off an exam table with no difficulty, her heart was normal, her abdomen was normal, her range of motion was normal, her back was normal.  There were no abnormal findings in Dr. Ballard's report.

Plaintiff's medical records in connection with treatment, as opposed to records in connection with applications for government benefits, show consistently normal test results.  In July 2009, during an emergency room visit, her eyes, head, heart, lungs, extremities, cognitive function, mentation, sensation, reflexes, strength and gait were all normal.  A CT exam of her brain was normal.  Chest x-rays were normal.  She was told to stop smoking.

In August 2009, a renal ultrasound was normal.  In September 2009 plaintiff had a cardiac stress test and was told she had a left bundle branch block which caused a "false positive" abnormality on the stress test.  A vascular study was normal.  The following day, her doctor noted that she appeared healthy, she had full range of motion bilaterally, her stents resulted in "zero blockage," and her chest pain was thought to be gastrointestinal in nature.  The diffuse 25-30% narrowings throughout her coronary system was due to "longstanding smoking history."  Yet plaintiff never tried to stop smoking and never cut down on the amount she was smoking.  Plaintiff was offered

Chantix several times during the course of the record and she was strongly urged to stop smoking over and over, but the record shows she never filled a Chantix prescription and never cut down on her smoking.

In October 2009, plaintiff was alert and oriented, her mood and affect were normal, her breath sounds were normal, heart was normal, abdomen and bowel sounds were normal, and she had full range of motion in all of her extremities. Plaintiff told Dr. Sutterer that she had oral cancer; however, no such finding had been made by any doctor according to the record before me.

In November 2009, plaintiff said that her medication allowed her to remain active and working. She described her pain as a 1 on a scale of 1 to 10 and that was "without" Darvocet, a narcotic pain reliever. She was alert and oriented with normal mood and affect. Her chest was normal, heart was normal, abdomen and bowel sounds were normal, and she had full range of motion in her extremities with no abnormalities in her back.

In December 2009, she again said that her medication helped with pain control and allowed her to be active despite her continued smoking. Her back was normal, she had full range of motion in her extremities with no tenderness, she was oriented times three with normal mood and affect.

In March 2010, plaintiff was able to clean with "lots of chemicals," and she continued to smoke. She was noted to be alert and oriented with normal mood and affect, her chest was normal, breathing was normal, heart was normal, abdomen and

bowel sounds were normal, she had full range of motion in her extremities with no abnormalities in her back.

In September 2010, plaintiff's stress echocardiogram was normal.

In March 2011, plaintiff went to the emergency room and venous Doppler study was normal. While at the emergency room, she did not mention the suicidal ideation that she had reported a few months earlier in an attempt to get government benefits. In June 2011, she saw Dr. Garner to establish care and denied fatigue, cough, shortness of breath, chest pain, exertional chest pain or discomfort, abdominal pain, change in bowel habits, constipation, diarrhea, reflux symptoms, and indigestion. Her physical exam was entirely normal. A month later she saw Dr. Garner again due to a bluish color on her fingers and toes. Her physical exam was entirely normal. She was taking only over-the-counter Tylenol for pain at the time. Her mood, speech, judgment and insight were all normal.

The only limitations found in the medical records are those associated with plaintiff's attempt to get government benefits, not in her treatment records. The mental impairments found by doctors were based entirely on plaintiff's noncredible subjective complaints -- complaints that were not made in connection with treatment, only in connection with an attempt to get benefits. The only limitation on lifting in this record was made by Dr. Ballard, again in connection with plaintiff's attempt to get benefits and again based solely on her subject complaint of coronary artery disease (which was not true). Dr. Ballard's exam of plaintiff was entirely normal.

Based on all of the above, I find that the ALJ's thorough review of the record, his thorough analysis of the record, and his conclusions are based on substantial evidence in the record as a whole. Therefore, plaintiff's motion to reverse the decision is unfounded and will be denied.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 22, 2013